844 So.2d 629 (2003)
Daniel O. CONAHAN, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC00-170.
Supreme Court of Florida.
January 16, 2003.
Rehearing Denied April 24, 2003.
*632 James Marion Moorman, Public Defender, and Paul C. Helm, Assistant Public Defender, Tenth Judicial Circuit, Bartow, FL, for Appellant.
Charlie J. Crist, Jr., Attorney General, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Appellee.
PER CURIAM.
This is an appeal from convictions for first-degree murder and kidnapping. The appellant was sentenced to death for the first-degree murder conviction and sentenced to fifteen years' imprisonment for the kidnapping conviction. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm both convictions and sentences.

FACTS
On April 16, 1996, Richard Montgomery, who lived with his sister, was with Bobby Whitaker, Gary Mason, and other friends when he mentioned that he was going out to make a few hundred dollars and would be back shortly. When asked whether it was legal, he smiled. Montgomery also told his mother that someone had offered to pay him $200 to pose for nude pictures, but he did not tell her who made the offer. In the same conversation, Montgomery mentioned that he had recently met the defendant Daniel O. Conahan, Jr., who lived in Punta Gorda Isles and was a nurse at a medical center. The last time friends saw Montgomery alive was on April 16 between 4 p.m. and 7 p.m.
The next day, April 17, Thomas Reese and Michael Tish, who were storm utility engineers for Charlotte County, discovered a human skull in a remote, heavily wooded area off of Highway 41 and immediately notified the police department. While searching the scene, deputies found the nude body of a young, white male that was later identified as Richard Montgomery. He had visible signs of trauma to the neck, waist, and wrists, and the genitalia had been removed. The forensic lab personnel arrived and collected various items from the scene, including a rope found on the top of a nearby trash pile, carpet padding that covered the victim's body, a skull and a torso (neither of which belonged to the victim), a gray coat, and various combings from the victim's arms, hands, chest, pubic area, and thighs. On the following day, Deputy Todd Terrell arrived on the scene with a K-9 dog which showed significant interest in a sabal palm tree, specifically the side of the tree which was somewhat flattened and damaged.
An autopsy revealed that Montgomery died as a result of strangulation. He had two ligature marks on the front of his neck, two horizontal marks on the right side of his chest, and abraded grooves around his wrists. All of the grooves were *633 of similar width, did not extend to Montgomery's back, and were consistent with marks that would be left on an individual who had been tied to a tree.
Due to the unique nature of the homicide (being tied to a tree naked and then strangled), police reviewed a similar assault reported on August 15, 1994. The victim, Stanley Burden, was a high school drop-out who, like Montgomery, had difficulty keeping a steady job and had physical features similar to those of Montgomery. The report indicated that Burden met Conahan, who offered to pay him $100 to $150 to pose for nude photographs. Burden agreed and Conahan drove him to a rocky dirt road in a secluded area where Conahan pulled out a duffle bag with a tarp and a Polaroid camera. The two men headed into the woods where Conahan laid the tarp out and asked Burden to take off his shirt and show a little hip. After taking numerous pictures of Burden, Conahan then took out a new package of clothesline so he could get some bondage pictures. He asked Burden to step close to a nearby tree and then clipped the clothesline in several pieces, draping them over Burden to make it look like bondage. Conahan moved behind Burden, snapped the rope tightly around him, pulled his hands behind the tree, placed ropes around his legs and chest, and wrapped the rope twice around Burden's neck. Conahan then performed oral sex on Burden and attempted to sodomize him. Burden fought to position himself in the middle of the tree while Conahan tried to pull him to the side to have anal sex. After many unsuccessful attempts, Conahan snapped the rope around Burden's neck, placed his foot against the tree, and pulled on the rope in an attempt to strangle Burden, who tried to slide around the tree to keep his windpipe open. Conahan hit Burden in the head and unsuccessfully attempted to strangle him for thirty minutes. Conahan asked Burden why he would not die and finally gave up, gathered his possessions, and left. Burden freed himself, went to a local hospital, and received treatment for his injuries. The police located the crime scene and found that one of the melaleuca trees had ligature indentions that corresponded with Burden's injuries.
Based on this information, the police began an undercover investigation of Conahan. On May 24, 1996, Deputy Scott Clemens was approached by Conahan at Kiwanis Park, and Conahan offered Clemens $7 to show his penis or $20 if Clemens would allow Conahan to perform fellatio. Clemens refused the offer and the next day returned to the park where he again encountered Conahan, who offered him $150 to pose for nude photos.
On May 31, 1996, pursuant to a warrant, the police searched Conahan's residence and vehicles and obtained paint samples from his father's Mercury Capri, which Conahan occasionally used. The police then compared paint samples from the Capri with a paint chip from the victim's body and found that they were indistinguishable.
On February 25, 1997, Conahan was indicted for first-degree premeditated murder, first-degree felony murder, kidnapping, and sexual battery of Richard Montgomery. In the guilt phase of his trial, Conahan waived his right to trial by jury. The State presented evidence of the manner in which the victim's body was found and evidence obtained from the autopsy and the searches of Conahan's residence and vehicles. The State also presented evidence that on the day of Montgomery's disappearance, April 16, 1996, at 6:07 p.m., Conahan's credit card was used to purchase clothesline, Polaroid film, pliers, and a utility knife from a Wal-Mart store in Punta Gorda. Still *634 photos showed that minutes later, at 6:12 p.m., Conahan withdrew funds from an ATM which was located close to the Wal-Mart.
The trial court permitted the State to introduce Williams[1] rule evidence of Burden's attempted murder and sexual battery, ruling that the evidence was sufficiently similar to the evidence leading up to Montgomery's death so as to constitute a unique modus operandi sufficient to establish the identity of Montgomery's murderer. After the guilt phase of the trial was completed, the trial court found and adjudicated Conahan guilty of first-degree premeditated murder and kidnapping.
On November 1, 1999, the penalty phase of Conahan's trial was conducted before a jury at which time photos taken at the crime scene of the victim's body were published, and Deputy Gandy testified relative to the crime scene and how the body was found. Gandy further testified that during an interview Conahan told him that he had a fantasy involving bondage and sex.
The medical examiner, Dr. Carol Huser, testified regarding the autopsy report prepared by Dr. Imami.[2] After examining Dr. Imami's report and viewing the autopsy photographs, Dr. Huser concluded that Montgomery died by ligature strangulation. The autopsy photographs were published to the jury. Dr. Huser also testified that being killed in such a manner required applying pressure for a length of time notwithstanding the fact that the victim loses consciousness after only a few seconds. She further opined that to be killed by strangulation would be terrifying.
Conahan's aunt, Betty Wilson, testified on behalf of the defense that Conahan was a jovial, personable individual who participated in family activities and cared for his ailing mother before she died. Robert Lindy and his daughter Nancy Thomson, the father and sister of Hal Lindy, who was Conahan's roommate and lover when he lived in Chicago, testified that Conahan was like another son and brother to them. Conahan was instrumental in helping Hal and Nancy overcome alcoholism, was considered one of the family, and was included in many family functions. Thereafter, the defense rested its case.
Before the jury deliberated, the trial court gave instructions relative to the following aggravators: (1) the murder was heinous, atrocious, or cruel (HAC); (2) the murder was cold, calculated, and premeditated (CCP); and (3) the murder was committed during the course of a kidnapping. By a vote of twelve to zero, the jury recommended the death penalty. A Spencer[3] hearing was held on November 5, 1999, and on December 10, 1999, Conahan was sentenced to death for the first-degree murder of Richard Montgomery and to fifteen years' imprisonment for kidnapping.

APPEAL

A. Motion for Judgment of Acquittal
On appeal Conahan raises five issues. In his first two issues, he contends that the trial court erred in denying his motion for judgment of acquittal because the State's circumstantial evidence was legally insufficient. We disagree.
As a general rule with regard to a motion for judgment of acquittal, "[t]he question of whether the evidence fails to exclude all reasonable hypotheses of innocence *635 is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, [this Court] will not reverse." State v. Law, 559 So.2d 187, 188 (Fla.1989).[4] In addition,
[t]he court's view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.
Perry v. State, 801 So.2d 78, 84 (Fla.2001) (citing State v. Law, 559 So.2d 187, 189 (Fla.1989)). "The trial court's finding denying a motion for judgment of acquittal will not be reversed on appeal if there is competent substantial evidence to support the jury's verdict." Id.

1. Premeditation
"Premeditation is defined as `more than a mere intent to kill; it is a fully formed conscious purpose to kill.'" Green v. State, 715 So.2d 940, 943 (Fla.1998) (quoting Coolen v. State, 696 So.2d 738, 741 (Fla.1997)). This purpose to kill must exist for sufficient time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." Id. at 944 (quoting Coolen, 696 So.2d at 741). However, premeditation may also "be formed in a moment and need only exist `for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.'" DeAngelo v. State, 616 So.2d 440, 441 (Fla. 1993) (quoting Asay v. State, 580 So.2d 610, 612 (Fla.1991)). Premeditation can be demonstrated by circumstantial evidence. See Woods v. State, 733 So.2d 980, 985 (Fla. 1999). As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Green, 715 So.2d at 944 (quoting Holton v. State, 573 So.2d 284, 289 (Fla.1990)); see Gore v. State, 784 So.2d 418, 429 (Fla. 2001).
In applying the abovementioned principles, the State presented competent, substantial evidence supporting Conahan's conviction for first-degree premeditated murder. The official cause of Montgomery's death was asphyxiation, secondary to ligature strangulation. Dr. Imami testified that there were two ligature marks on the victim's neck and groove marks around his lower chest area and across his abdomen. Because the groove marks were only across the front and sides of the victim and not on his back, they were consistent with being tied to a tree. Montgomery also suffered extensive crisscross scratches and abrasions on his back which were consistent with an individual squirming or moving while being tied to a tree.
The State's Williams rule evidence demonstrated that Conahan killed Montgomery in the same manner in which he attempted to kill Stanley Burden. Montgomery and Burden were similar physically; neither one completed high school; both had difficulty in maintaining employment and were in need of money when Conahan solicited them to pose nude for money in a secluded wooded area. Both were tied to a tree and suffered similar abrasions and ligature wounds.
*636 Because the circumstantial evidence standard does not require the factfinder to believe the defense's version of the facts on which the State has produced conflicting evidence, the factfinder, in this case the trial judge, properly concluded that Conahan's hypothesis of innocence was rebutted by competent, substantial evidence. See Woods v. State, 733 So.2d 980, 986 (Fla.1999); Crump v. State, 622 So.2d 963, 971 (Fla.1993). Based upon the manner of Montgomery's death, his antemortem injuries, and the Williams rule evidence relative to the attempted sexual battery and attempted murder of Stanley Burden, the State presented sufficient evidence to prove premeditation. Accordingly, we affirm the trial court's denial of the motion for judgment of acquittal.

2. Kidnapping
In his second issue, Conahan contends that the trial court erred in denying his motion for judgment of acquittal on the kidnapping charge because the State's circumstantial evidence was legally insufficient to establish that the victim did not consent to being tied to a tree for the purpose of posing for nude bondage photos. We disagree.[5]
On April 17, 1996, the day after Montgomery's death, his body was found in a secluded, wooded area. Dr. Imami, the medical examiner who conducted Montgomery's autopsy, testified during the guilt phase to the following injuries that Montgomery sustained: (1) ligature wounds or well-depressed grooves to the neck which appeared to be caused by some type of rope; (2) ligature wounds to the lower portion of the chest; (3) crisscrossed abrasions on the back which Dr. Imami believed were inflicted after death or at the time of death;[6] and (4) ligature marks on Montgomery's wrists and lower legs. Dr. Imami opined that the ligature wounds on Montgomery's neck and chest area occurred before death.
The trial court made the following finding in its sentencing order:
1. The crime was committed while the defendant was engaged in the commission of kidnapping. The indictment in this case charged the defendant with kidnapping the victim as well as the first-degree murder of the victim. As noted above, the Court found the defendant guilty of both offenses. While the victim apparently went willingly with the defendant to the crime scene to participate in something of a nude photographic bondage session, it is ludicrous to conclude that he consented to the lethal form of bondage made apparent by the wounds to his body prior to his death. The pre-mortem wounds to his body reflect a struggle for his life. His wrists and lower body all bore ligature wounds; his back bore criss-cross scratchings produced by his struggle while being tied to a tree or other such rough surface. It is obvious that during his ordeal he was confined or imprisoned against his will. Such confinement *637 against his will was for the obvious purpose of inflicting bodily harm upon the victim or terrorizing him.
We conclude that the State presented competent, substantial evidence to prove a prima facie case of kidnapping. Based upon the victim's extensive antemortem ligature wounds and abrasions on his back, the victim was confined against his will at some point and apparently struggled for his life. See Sochor v. State, 619 So.2d 285 (Fla.1993); Gore v. State, 599 So.2d 978 (Fla.1992); Bedford v. State, 589 So.2d 245 (Fla.1991); Mines v. State, 390 So.2d 332 (Fla.1980). Furthermore, Burden's testimony relative to his nearly fatal encounter with the defendant established a common scheme of luring young men into a secluded, wooded area for sexual pleasure and murdering them under the guise of posing for nude bondage pictures. See Commonwealth v. Miller, 541 Pa. 531, 664 A.2d 1310, 1318 n. 14 (1995) (finding that circumstantial evidence of prior kidnapping established pattern of behavior constituting a common scheme). Accordingly, we affirm the trial court's denial of Conahan's motion for judgment of acquittal relative to the kidnapping charge.

B. Jury Instructions
In his third issue, Conahan contends that the trial court erred by instructing the jury on the following two aggravating factors: (1) the murder was cold, calculated, and premeditated (CCP); and (2) the murder was committed during the course of a kidnapping. Again, we disagree.
This Court defined the CCP aggravating factor as follows:
[I]n order to find the CCP aggravating factor under our case law, the jury must determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.
Jackson v. State, 648 So.2d 85, 89 (Fla. 1994) (citations omitted). In order to prove the existence of the CCP aggravating factor, the State must demonstrate a heightened level of premeditation establishing that the defendant had a careful plan or prearranged design to kill. See Bell v. State, 699 So.2d 674, 677 (Fla.1997).
In finding the CCP aggravator, the trial court ruled as follows in its sentencing order:
2. The crime was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. Shortly before picking up the victim, the defendant purchased rope, side-cutter pliers, and a sharp utility knife. The rope was the same type and size as that used to strangle Richard Montgomery; it was remarkably similar to the type used roughly two years earlier by the defendant in his attempt to strangle Stanley Burden. The evidence of the attempted strangulation of Burden was admitted into the guilt phase trial before the court as Williams rule evidenceWilliams v. State, 110 So.2d 654 (Fla. 1959)but it was not admitted in the penalty phase trial before the jury. The implements of bondage, strangulation, and cutting were the same in both instances; the pretense of posing for bondage photos was the same; the ligature wounds to the neck and throat of Stanley Burden, who managed to survive, and Richard Montgomery, who did not, were strikingly similar. The court discusses these similarities in *638 the context of the sentencing issue only because of the relevance to this aggravator. The method, techniques, and other similarities evidence a cold, calculated, systematic approach to luring Richard Montgomery to the area where he was killed after being tricked into a bondage situation, from which he could not escape. The purchases and methodology employed by the defendant in preparing for this crime manifest the same type of heightened premeditation found in Jennings v. State, 718 So.2d 144 (Fla.1998), and Bell v. State, 699 So.2d 674 (Fla. 1997), cert. denied, 522 U.S. 1123, 118 S.Ct. 1067, 140 L.Ed.2d 127 (1998). The State has proven this aggravating factor beyond a reasonable doubt.
Based upon the evidence presented by the State, we agree with the trial court's findings and conclusion that the CCP aggravating factor was established, and the trial court properly instructed the jury relative to that aggravator. See Ford v. State, 802 So.2d 1121, 1133 (Fla.2001) ("A trial court may give a requested jury instruction on an aggravating circumstance if the evidence adduced at trial is legally sufficient to support a finding of that aggravating circumstance.").
Conahan's claim that the jury should not have been instructed regarding murder committed during the course of a kidnapping is procedurally barred. Because Conahan failed to object to the jury instruction, he did not properly preserve it for appellate review. Thus, this Court will not review its merits. See Bell v. State, 699 So.2d 674, 678 (Fla.1997) (concluding that the defendant's issue relative to the trial court's error in instructing the jury on the CCP aggravating circumstance was procedurally barred because he failed to preserve the issue); Geralds v. State, 674 So.2d 96, 98 (Fla.1996) (holding that defendant's issue regarding the constitutionality of two jury instructions was not preserved because defendant failed to object with specificity in the trial court below).

C. Prosecutorial Comments
In his fourth claim, Conahan contends that the prosecutor violated his right to a fair trial by making improper comments in both his opening and closing statements to the jury in the penalty phase of the trial.

1. Prosecutor's Opening Statement
"The purpose of an opening statement is for counsel to outline the facts expected to be proved at trial. It is not the appropriate place for argument." First v. State, 696 So.2d 1357, 1358 (Fla. 2nd DCA 1997). Moreover, although "the rule against inflammatory and abusive argument by a state's attorney is clear, each case must be considered upon its own merits and within the circumstances pertaining when the questionable statements were made." Muehleman v. State, 503 So.2d 310, 317 (Fla.1987) (quoting Bush v. State, 461 So.2d 936, 941 (Fla.1984)).
In his opening statement to the jury during the penalty phase, the prosecutor stated:
[PROSECUTOR]: The evidence will further show that the motive, the why that this crime occurred, again, to move from the mind of the Defendant Daniel Conahan to actually say that is he began to put it into plan, put the plan into effect in 1994, that is he moved beyond a reasonable doubt thinking about this fantasy to attempting to act it out.
The evidence will show in 1994, the Defendant while cruising Lyons Park in South Fort Myers
[DEFENSE COUNSEL]: May we approach the bench, Your Honor.
[COURT]: Yes.
Defense counsel objected to the prosecutor's statement relative to Conahan's seduction *639 and attempted strangulation of Stanley Burden. The Williams rule evidence was the subject of Conahan's motion in limine which the trial court had not ruled upon. Defense counsel argued that it would be appropriate for the State to approach the bench and obtain permission to elicit Williams rule testimony in light of the trial court's reserved ruling.[7] Defense counsel believed that the court's reserved ruling also applied to comments about Williams rule evidence in the opening statement. The State argued that it was only commenting upon the evidence it would present to support one of the three aggravating circumstances that would be proved during the penalty phase: that the murder was cold, calculated, and premeditated (CCP). The trial court ruled as follows:
[COURT]: Well, I don't know. We're not talking about Burden. Yet, I'm not telling you that I'm going to admit Burden, but I'm going to rule the State is entitled to make a case of cold, calculated premeditation, to that extent. I'm going to allow it. All right. Please proceed.
During the penalty phase, the State called witness Deputy Pedro Soto to the stand. Before Soto was questioned about the Williams rule evidence, the prosecutor requested a ruling from the trial court regarding its admissibility. The trial court finally ruled that the Williams rule evidence was inadmissible in the penalty phase due to its overwhelming prejudicial effect.[8]
Even though the State is entitled to present its version of the facts in its opening statement, see Rhodes v. State, 638 So.2d 920 (Fla.1994), we find that the trial court abused its discretion when it allowed the State to comment upon Conahan's attempted murder and attempted sexual battery of Stanley Burden in its opening statement to the penalty phase jury. The trial court had the admissibility of that very evidence under advisement. Accordingly, it was improper for the State to comment in its opening statement upon evidence that was under advisement and which was ultimately determined to be inadmissible in the penalty phase of the trial.
The next inquiry is whether the prosecutor's comments were so prejudicial as to vitiate the entire trial. See Woodel v. State, 804 So.2d 316, 323 (Fla. 2001). The State's improper remarks relative to the Burden incident in the penalty phase cannot be "presumed harmful" regarding Conahan's guilt or innocence because he had already been found guilty of first-degree premeditated murder in the guilt phase of the trial. See Gore v. State, 719 So.2d 1197, 1199 (Fla.1998). Second, before the parties gave their opening statements in the penalty phase, the trial court instructed the jury that opening remarks were not evidence and again reiterated those instructions at the end of closing arguments. See Massachusetts v. Simpson, 434 Mass. 570, 750 N.E.2d 977, 992 (2001) (finding that defendant's substantial rights were not affected where the trial court twice instructed the jury that the attorneys' opening and closing statements *640 were not evidence); Barnes v. Arkansas, 346 Ark. 91, 55 S.W.3d 271, 279 (2001) (same). Furthermore, "the purpose of opening argument is to outline what an attorney expects to be established by the evidence," Occhicone v. State, 570 So.2d 902, 904 (Fla.1990), and our review of the record reveals the prosecutor's good faith attempt to do that. For these reasons, we hold that the prosecutor's opening comments relative the Williams rule evidence in the penalty phase constituted harmless error.

2. Prosecutor's Closing Statement
In closing argument, counsel is permitted to review the evidence and fairly discuss and comment upon properly admitted testimony and logical inferences from that evidence. See Mann v. State, 603 So.2d 1141, 1143 (Fla.1992) ("The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence."); Bertolotti v. State, 476 So.2d 130 (Fla.1985). A prosecutor may refer to the evidence as it exists before the jury and comment on the uncontradicted or uncontroverted nature of it during closing argument so long as it is not susceptible to being interpreted as a comment on the defendant's failure to testify. See Rodriguez v. State, 753 So.2d 29, 37-38 (Fla.2000).
One of the two preserved prosecutorial comments that Conahan challenged was as follows:
Clearly, early in his life, he was capable of and did do some good and commendable things. And yet, he makes this choice to do evil later in his life so hard to understand. He wasn't abused. He wasn't mistreated. There was no evidence of mental difficulties or substance abuse or drug abuse. No financial
Conahan timely objected and complained that the prosecutor remarked upon the lack of certain mitigating factors. The trial court overruled the objection.
The record reflects that in light of Conahan's presentation of mitigating evidence, the prosecutor commented in his closing argument that there was no evidence presented regarding other possible mitigators. He pointed out that Conahan did not show that he suffered from prior child abuse or drug abuse, or had a history of mental difficulties and mistreatment. In making such a remark, the prosecutor was commenting upon the lack of certain mitigating evidence. His comment did not implicate the defendant's right to remain silent; rather, it concerned the dearth of mitigating evidence. See People v. Lewis, 25 Cal.4th 610, 106 Cal.Rptr.2d 629, 22 P.3d 392, 433 (2001) (holding that the prosecutor's reference to the nonexistence of mitigating evidence was not a comment on the defendant's failure to testify). We find that the assistant state attorney's remark was not improper and affirm the trial court's ruling.
The other preserved prosecutorial comment was provided as follows:
As I was going home last night I thought about this case and I thought about the remarks that I might make to you today and actually stopped and wrote some things down. I have found that when I get these ideas, if I don't write them down, I often forget them. Here's what I wrote down and I'll close with this: Mercy for a defendant means nothing if we do not also honor justice for the victim. The statutory scheme in Florida attempts to strike a balance between the equally important values in our society of mercy to a defendant and justice to a victim. It attempts
This Court has consistently held that it is improper during closing argument *641 for the prosecutor to encourage the jury to show a defendant the same amount of mercy as he showed his victim because such argument tends to unnecessarily appeal to the sympathies of the jury. See Richardson v. State, 604 So.2d 1107, 1109 (Fla. 1992) (finding that the prosecutor committed error in asking the jury to show the defendant as much pity as he showed his victim); Rhodes v. State, 547 So.2d 1201, 1206 (Fla.1989) (finding that the prosecutor's argument that jury show defendant same mercy shown to the victim on the day of her death was "an unnecessary appeal to the sympathies of the jurors, calculated to influence their sentence recommendation").
In the present case, the prosecutor spoke of mercy; however, he did not urge the jury to show the defendant as much mercy as he showed his victim. The prosecutor made the statement that there is a balancing act between mercy for a defendant and justice for the victim. We find that the prosecutor's remark did not inflame or unnecessarily evoke the sympathies of the jury. Accordingly, we affirm the trial court's ruling.
In regard to other prosecutorial comments that Conahan raised on appeal, he failed to object to them in the trial below; thus, he failed to properly preserve those comments for appellate review. See Chandler v. State, 702 So.2d 186, 191 (Fla. 1997); Kilgore v. State, 688 So.2d 895, 898 (Fla.1996). The only exception to this procedural bar "is where the unobjected-to comments rise to the level of fundamental error, which has been defined as error that `reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Brooks v. State, 762 So.2d 879, 899 (Fla.2000) (quoting McDonald v. State, 743 So.2d 501, 505 (Fla.1999)); see Urbin v. State, 714 So.2d 411, 418 n. 8 (Fla.1998); Bonifay v. State, 680 So.2d 413, 418 n. 9 (Fla.1996). Having reviewed the prosecutor's entire closing argument in light of the unobjected-to comments, none of the comments, individually or collectively, rose to the level of fundamental error. Furthermore, we conclude that the unobjected-to comments, when viewed in conjunction with the objected-to comments, did not deprive Conahan of a fair penalty phase hearing. See Evans v. State, 808 So.2d 92 (Fla.2001), cert. denied, ___ U.S. ____, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002).

D. Admissibility of Autopsy Photographs
In his fifth issue, Conahan contends that the trial court violated his right to a fair trial by admitting inflammatory autopsy photos and certain photos from the crime scene. Admissibility of photographic evidence of a murder victim is within the sound discretion of the trial court, and its ruling will not be disturbed on appeal absent abuse. See Gudinas v. State, 693 So.2d 953 (Fla.1997).
Relevancy, not necessity, is the test for admissibility of photographic evidence of a murder victim. See Ruiz v. State, 743 So.2d 1, 8 (Fla.1999); Pope v. State, 679 So.2d 710 (Fla.1996). Such photographs are relevant where they are used to "explain a medical examiner's testimony, to show the manner of death, the location of wounds, and the identity of the victim." Larkins v. State, 655 So.2d 95, 98 (Fla.1995). Admission of allegedly offensive photographs is appropriate where they are independently relevant or corroborative of other evidence. See Czubak v. State, 570 So.2d 925, 928 (Fla.1990).
Based upon the State's arguments, the photos of the crime scene and the autopsy were relevant for the following *642 reasons: (1) to prove the proposed aggravator, CCP; (2) to explain the medical examiner's testimony; and (3) to show the nature and circumstances of the crime. See Mansfield v. State, 758 So.2d 636, 648 (Fla.2000), cert. denied, 532 U.S. 998, 121 S.Ct. 1663, 149 L.Ed.2d 644 (2001); Rutherford v. Moore, 774 So.2d 637, 647 (Fla. 2000); Willacy v. State, 696 So.2d 693, 695 (Fla.1997). Thus, we find that the trial court properly admitted the photos into evidence. See Halliwell v. State, 323 So.2d 557, 560 (Fla. 1975) ("Those who create crimes of violence often must face the record of their deeds in court.").[9]

PROPORTIONALITY
This Court performs proportionality review to prevent the imposition of "unusual" punishments contrary to article I, section 17 of the Florida Constitution. See Tillman v. State, 591 So.2d 167, 169 (Fla.1991). In deciding whether death is a proportionate penalty, this Court must consider the totality of the circumstances of the case and compare the case with other capital cases. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). It is not a comparison between the number of aggravating and mitigating circumstances. See Rogers v. State, 783 So.2d 980, 1002 (Fla.2001); Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Therefore, this Court must determine whether the imposition of the death penalty in this case is proportionate when compared to similar crimes.
The trial court found three aggravating factors beyond a reasonable doubt: (1) that the murder was committed during the course of a kidnapping; (2) that the murder was cold, calculated, and premeditated (CCP); and (3) that the murder was heinous, atrocious, or cruel (HAC). The trial court rejected Conahan's only statutory mitigating factor, consent of the victim. Conahan collectively presented five nonstatutory mitigating factors,[10] and the trial court gave the first three some weight, rejected the fourth one, and gave the fifth one little weight.
After reviewing the circumstances in the instant case, we find that the death penalty is proportionate when compared to other cases in which death was found to be the appropriate penalty. See Hauser v. State, 701 So.2d 329 (Fla.1997) (finding death sentence proportionate where the victim was strangled and the trial court found the three aggravators of heinous, atrocious, or cruel; cold, calculated, and premeditated; and pecuniary gain balanced against one statutory mitigator and four nonstatutory mitigators); Arbelaez v. State, 626 So.2d 169 (Fla. 1993) (affirming imposition of the death penalty where trial court found the three aggravators of heinous, atrocious, or cruel; cold, calculated, and premeditated; and murder committed during a kidnapping balanced against one statutory mitigator and one nonstatutory mitigator); Mann v. State, 603 So.2d 1141 (Fla. 1992) (upholding death sentence for murder *643 where the trial court found the aggravating circumstances of prior violent felony, murder during the commission of a felony, and the murder was heinous, atrocious, or cruel and several nonstatutory mitigating circumstances, including remorse).
Accordingly, we affirm the convictions and sentences, including the sentence of death.
It is so ordered.
PARIENTE, LEWIS, and QUINCE, JJ., and SHAW, Senior Justice, concur.
HARDING, Senior Justice, concurs in part and dissents in part with an opinion, in which WELLS, J., concurs.
ANSTEAD, C.J., concurs as to the conviction and concurs in result only as to the sentence.
HARDING, Senior Justice, concurring in part and dissenting in part.
I disagree with the majority's conclusion that "it was improper for the State to comment in its opening statement upon evidence that was under advisement and which was ultimately determined to be inadmissible in the penalty phase of the trial." Not only is this conclusion reached without citing to any specific authority, it departs from the reasonable latitude permitted counsel during opening statements to discuss what evidence counsel intends to present during trial and the reasonable inferences that can be drawn therefrom.
Opening remarks are not evidence, and the purpose of opening argument is to outline what the attorney expects to be established by evidence. See Occhicone v. State, 570 So.2d 902, 904 (Fla. 1990) (citing Whitted v. State, 362 So.2d 668 (Fla. 1978)). Indeed, the relevant part of the Florida Standard Jury Instruction in Criminal Cases governing pretrial instructions and the instruction specifically given in this case provides:
At the beginning of the trial the attorneys will have an opportunity, if they wish, to make an opening statement. The opening statement gives the attorneys a chance to tell you what evidence they believe will be presented during the trial. What the lawyers say is not evidence, and you are not to consider it as such.
Fla. Std. Jury Instr. 2.1 (emphasis added).
Frequently, attorneys make statements in opening that they reasonably expect the evidence to support, only to have witnesses change their testimony or become unavailable. Such comments are not reversible error....
... It cannot be error in opening statement to outline the case which counsel anticipates proving through the evidence and witnesses, even though circumstances change before the end of the trial.
Goutis v. Express Transport, Inc., 699 So.2d 757, 763 (Fla. 4th DCA 1997).
Here the issue was raised by defense counsel, and after deliberation at sidebar, the trial judge permitted the prosecutor to refer to evidence which was the subject of a pending motion in limine during the prosecutor's opening statement. I cannot say that the judge abused his discretion. It was my experience as a trial judge that counsel makes an opening statement at his or her own peril. That is, if counsel fails to present evidence as promised during the opening statement, opposing counsel is free to expose this omission to the trier of fact and, in effect, undermine the credibility of counsel's presentation. Indeed, the practice of pointing out "undelivered" promises of evidence has been a tactic for attorneys for time untold, and counsel who speaks of potentially inadmissible evidence during opening statement therefore runs *644 the risk of such exposure by opposing counsel.
Finally, although the majority cites to no specific authority supporting its conclusion, appellant contends that the instant case is similar to Gore v. State, 719 So.2d 1197 (Fla.1998), and requires reversal. Quite unlike Gore, however, where the prosecutor blatantly disregarded a specific pretrial ruling concerning extremely prejudicial information, here the prosecutor had every reason to believe that testimony by and about the victim in the Burden incident would be admissible since it had been allowed following the trial court's admission of it in the guilt phase. There was no specific prior adverse ruling.[11] Moreover, unlike counsel in Gore, here the prosecutor complied with the trial court's ruling by approaching the bench prior to introducing the evidence at issue.
Given the above analysis and the broad discretion afforded trial courts in controlling opening statements, see Fernandez v. State, 730 So.2d 277, 281 (Fla.1999), I would therefore conclude, contrary to the majority's position, that the trial court did not abuse its discretion when it permitted the State to refer to evidence which was the subject of a pending motion in limine during its opening statement.
WELLS, J., concurs.
NOTES
[1] Williams v. State, 110 So.2d 654 (Fla.1959).
[2] Dr. Imami, the medical examiner who conducted the autopsy of Richard Montgomery, was out of the country and unavailable to testify at the penalty phase.
[3] Spencer v. State, 615 So.2d 688 (Fla.1993).
[4] In the present case, the trial judge was the trier of fact in the guilt phase.
[5] Section 787.01(1)(a), Florida Statutes (1995), defines kidnapping as follows:

The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against his will and without lawful authority, with intent to:
1. Hold for ransom or reward or as a shield or hostage.
2. Commit or facilitate commission of any felony.
3. Inflict bodily harm upon or to terrorize the victim or another person.
4. Interfere with the performance of any governmental or political function.
[6] Dr. Imami noted that the ligature marks appeared only on the front portion of Montgomery's body. They did not appear on his back, which was consistent with Montgomery being tied to a tree or post.
[7] The trial court ruled as follows on the admissibility of the Williams rule evidence in the penalty phase:

So I'm just going to resolve that issue on any Williams rule evidence by requiring the State before it makes an offer or asks a question that would elicit Williams rule testimony to approach the bench with defense counsel and let us argue at that point the admissibility on the proffered Williams rule evidence.
[8] Conahan waived his right to a jury during the guilt phase; however, a jury was present during the penalty phase.
[9] In supplemental briefing and a notice of supplemental authority, Conahan asserts that he is entitled to relief pursuant to the United States Supreme Court's recent opinions in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court addressed a similar contention in Bottoson v. Moore, 833 So.2d 693,(Fla. 2002), cert. denied, 123 S.Ct. 662(2002), and King v. Moore, 831 So.2d 143 (Fla.2002), cert. denied, 123 S.Ct. 657 (2002), and denied relief. We therefore find that Conahan is likewise not entitled to relief.
[10] Conahan's collective nonstatutory mitigators were as follows: (1) loyalty, affection, and service to his parents; (2) self-improvement by enrolling in nursing school; (3) ability to maintain good familial relationships; (4) open, unselfish, polite personality; and (5) hardworking character.
[11] The trial court certainly did not react as if there had been a blatant disregard of an earlier ruling, and in fact there was not. At a hearing prior to the penalty phase proceeding the trial court reserved ruling on Williams rule evidence "by requiring the state before it makes an offer or asks a question that would elicit Williams rule testimony to approach the bench with defense counsel and let us argue at that point the admissibility of the proffered Williams rule evidence." (Emphasis added.) The trial court did not state or intend to so limit opening statements.