PER CURIAM.
Paul Christopher Hildwin was convicted and sentenced to death in 1986 for the murder of Vronzettie Cox. This Court affirmed Hildwin’s conviction and sentence of death on direct appeal. Hildwin v. State (Hildwin I), 531 So.2d 124, 129 (Fla.1988). Hildwin was subsequently granted a new penalty-phase trial on the basis that his trial counsel rendered ineffective assistance for failing to adequately investigate, prepare, and present mitigating evidence. Hildwin v. Dugger (Hildwin II), 654 So.2d 107, 110-11 (Fla.1995). After the new penalty-phase proceeding was held in 1996, Hildwin was again sentenced to death, and this Court affirmed his sentence on direct appeal. Hildwin v. State (Hildwin III), 727 So.2d 193, 198 (Fla.1998). Hildwin then filed a motion for postconviction relief attacking his death sentence under Florida Rule of Criminal Procedure 3.850, which was denied by the trial court after an evidentiary hearing.
This appeal follows from the denial of postconviction relief alleging ineffective assistance of counsel in the second penalty-phase proceeding.[1] For the reasons explained in this opinion, we affirm the trial court’s denial of Hildwin’s motion for post-conviction relief.
FACTS AND PROCEDURAL HISTORY
The following facts were set forth in this Court’s 1988 decision on direct appeal from the conviction and sentence:
*183 Appellant was arrested after cashing a check purportedly written to him by one Vronzettie Cox, a forty-two-year-old woman whose body had been found in the trunk of her car, which was hidden in dense woods in Hernando County. Death was due to strangulation; she also had been raped. Evidence indicated she had been killed in a different locale from where her body was found. Her purse, from which some contents had been removed, was found in dense woods, directly on line between her car and appellant’s house. A pair of semen-encrusted women’s underpants was found on a laundry bag in her car, as was a sweat-stained wash rag. Analysis showed the semen and sweat came from nonsecretor (i.e., one who does not secrete blood into other bodily fluids). Appellant, a white male, was found to be a nonsecretor; there was testimony that white male nonsecretors make up eleven percent of the population.
The victim had been missing for four days when her body was found. The man she lived with, one Haverty, said she had left their home to wash clothes at a coin laundry. To do so, she had to pass a convenience store. Appellant’s presence in the area of the store on the date of her disappearance had come about this way: He and two women had gone to a drive-in movie, where they had spent all their money. Returning home early in the morning, their car ran out of gas. A search of the roadside yielded pop bottles, which they redeemed for cash and bought some gasoline. However, they still could not start the car. After spending the night in the car, appellant set off on foot at 9 a.m. toward the convenience store near the coin laundry. He had no money when he left, but when he returned about an hour and a half later, he had money and a radio. Later that day, he cashed a check (which he later admitted forging) written to him on Ms. Cox’s account. The teller who cashed the check remembered appellant cashing it and recalled that he was driving a car similar to the victim’s.
The check led police to appellant. After arresting him the police searched his house, where they found the radio and a ring, both of which had belonged to the victim. Appellant gave several explanations for this evidence and several accounts of the killing, but at trial testified that he had been with Haverty and the victim while they were having an argument, and that when Haverty began beating and choking her, he left. He said he stole the checkbook, the ring, and the radio. Haverty had an alibi for the time of the murder and was found to be a secretor.
Appellant made two pretrial statements that are pertinent here. One was a confession made to a cellmate. The other was a statement made to a police officer to the effect that Ms. Cox’s killer had a tattoo on his back. Haverty had no such tattoo, but appellant did.
Hildwin I, 531 So.2d at 125-26. Hildwin was convicted of first-degree murder. During the penalty phase, Hildwin did not present any mental health expert testimony, but did present lay witness testimony that “was quite limited.” Hildwin II, 654 So.2d at 110 n. 7. The testimony “revealed that Hildwin’s mother died before he was three, that his father abandoned him on several occasions, that Hildwin had a substance abuse problem, and that Hildwin was a pleasant child and is a nice person.” Id. Following the penalty phase, the jury unanimously recommended death. The trial court followed the jury’s recommendation, finding four aggravators and no mitigation. This Court affirmed Hildwin’s conviction and sentence on direct appeal. Hildwin I, 531 So.2d at 129.
*184 Hildwin then filed a motion for postcon-viction relief under Florida Rule of Criminal Procedure 3.850 and a habeas petition. See Hildwin II, 654 So.2d at 108. Among other things, Hildwin asserted that his counsel was ineffective for failing to investigate and present mitigating evidence. Id. at 109. Am evidentiary hearing was held in which Hildwin put on testimony from experts and lay witnesses to show that counsel’s investigation and presentation of evidence was deficient and constituted ineffective assistance of counsel. This Court agreed, noting that Hildwin had “presented an abundance of mitigating evidence which his trial counsel could have presented at sentencing,” including two mental health experts that the trial court found “most persuasive and convincing,” as well as “substantial lay testimony.” Id. at 110 & n. 8. This Court vacated Hildwin’s sentence of death and remanded for a new penalty-phase trial. Id. at 111.
The new penalty-phase trial was held in 1996. At the trial, Hildwin presented two mental health experts, Drs. Maher and Berland, who testified that Hildwin had a brain injury or impairment and was mentally ill. Lay witnesses also testified that Hildwin had a horrible childhood, which included physical and mental abuse inflicted by his father, suicide attempts, and abandonment and neglect.
After the new penalty-phase trial, the jury voted to recommend the death sentence by a vote of eight to four, and the trial court sentenced Hildwin to death. In its resentencing order, the trial court found four aggravators: (1) Hildwin was under a sentence of imprisonment at the time of the murder; (2) he had previously been convicted of prior violent felonies; (3) the murder was committed for pecuniary gain; and (4) the murder was especially heinous, atrocious, or cruel (HAC). Hildwin III, 727 So.2d at 194.
In contrast to the first penalty phase in which no mitigation was found, the trial court found two statutory mitigators, both of which it assigned “some weight”: (1) Hildwin was under the influence of an extreme mental 'or emotional disturbance at the time of the murder; and (2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Id. Finally, the trial court found five nonstatutory mitigators, all of which it also assigned “some weight”: (1) Hildwin had a history of childhood abuse, including sexual abuse by his father; (2) he had a history of drug or substance abuse; (3) he had organic brain damage; (4) he had the ability to do well in a structured environment like prison; and (5) his type of mental illness was readily treatable in a prison setting. Id.
In reviewing proportionality, this Court explained the trial court’s evaluation of the mitigation:
While the trial court accorded “some weight” to a variety of statutory and nonstatutory mitigators, the trial court explained at length why it did not find the psychological mitigating evidence to be particularly compelling:
There is also the problem of [the psychological experts] not having talked to sufficient people who knew the defendant around the time of the crime. Dr. Berland testified that he had talked to no one who knew the defendant after 1979, and thus didn’t talk to any people who had been around the defendant close to the time of the murder. John Hildwin, who presented perhaps the most emotional testimony as to the abuse his brother suffered as a child, indicated that he had not seen the defendant since 1971.
Next, it should be noted that the experts, though generally agreeing *185 with each other, subtly differ with one another in their analysis. Dr. Maher opines that the defendant had an impaired ability to appreciate wrongness and conform his conduct based on a severe mental defect. Dr. Berland does not talk specifically about the defendant’s ability to appreciate the wrongfulness of his actions and to conform his action to the requirements of law, but is of the opinion that the defendant was mentally ill at the time of the crime. Dr. Berland believes that the defendant was under the influence of mental or emotional disturbance at the time of the crime; however, Dr. Berland was not able to say that the defendant was under the influence of “extreme” emotional disturbance at the time, but only classified the defendant as suffering from a “mild to moderate” condition. Dr. Maher says that the defendant was under the influence of an “extreme” mental or emotional defect at the time of the crime.
There is also a practical conflict between the opinions of the doctors, and the psychological picture they paint of the defendant, and with the way the defendant presented himself in court, as well as the way others who knew him close to the time of the crime described him. Dr. Maher spoke with a woman, Cynthia Wriston, who had known the defendant for some time and was with the defendant the night before the murder, who described the defendant as a “nice guy.” Dr. Ber-land testified that the defendant should not ever be properly described as “a nice guy.” Violet Hoyt described the defendant as “always polite.” She further said that Paul was okay around her, and never gave her any trouble. Henry Hoyt said the defendant was very nice to him whenever he saw him. Patricia Lee Hild-win, who married the defendant while he was in prison, testified that she had never seen the defendant hit anybody and never saw the defendant with a quick temper. She said that she never observed any truly bizarre behavior from the defendant. Dr. Berland had testified that [the] defendant would not have been fun to be around, and that he would have been an angry, irritable, volatile, explosive person.
Id. at 197-98. This Court affirmed the sentence on direct appeal. Id. at 198.
Hildwin filed a postconviction motion attacking the performance of his counsel in the second penalty-phase proceeding. The trial court granted an evidentiary hearing on the following two claims raised in the motion: (1) ineffective assistance of penalty-phase counsel for failing to investigate, prepare, and present mitigating evidence; and (2) ineffective assistance of penalty-phase counsel in failing to object to improper remarks made by the prosecutor in closing argument.[2] At the evidentiary *186 hearing, the following witnesses testified: Dr. Richard S. Greenbaum (an expert on posttraumatic stress disorder); Dr. Robert M. Berland (one of the mental health experts who testified at resentencing); William Hallman (resentencing co-counsel); and Richard Howard (resentencing lead counsel).[3]
ANALYSIS
Hildwin raises two issues for this Court’s review: (1) ineffective assistance of penalty-phase counsel for failing to investigate, prepare, and present mitigating evidence, and (2) ineffective assistance of penalty-phase counsel in failing to object to improper remarks made by the prosecutor in closing argument.[4]
Following the United States Supreme Court’s decision in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.
Schoenwetter v. State, 46 So.3d 535, 546 (Fla.2010) (quoting Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986)).
To establish the deficiency prong under Strickland, the defendant must prove that counsel’s performance was unreasonable under “prevailing professional norms.” Morris v. State, 931 So.2d 821, 828 (Fla.2006) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052). “A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time.” Strickland, 466 U.S. at 689, 104 *187 S.Ct. 2052. The defendant carries the burden to “overcome the presumption that, under the circumstances, the challenged action ‘might be considered sound trial strategy.’ ” Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). “Judicial scrutiny of counsel’s performance must be highly deferential.” Id. In Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000), this Court held that “strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.”
“Penalty phase prejudice under the Strickland standard is measured by whether the error of trial counsel undermines this Court’s confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court.” Stewart v. State, 37 So.3d 243, 253 (Fla.2010) (quoting Hurst v. State, 18 So.3d 975, 1013 (Fla.2009)). That standard does not “require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, _ U.S. _, 130 S.Ct. 447, 455-56, 175 L.Ed.2d 398 (2009) (alteration in original) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). “To assess that probability, [the Court] consider[s] ‘the totality of the available mitigation evidence ... ’ and ‘reweigh[s] it against the evidence in aggravation.’ ” Id. at 453-54 (quoting Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).
As to the application of the Strickland standard in a case involving the presentation of mitigating evidence, the United States Supreme Court has explained:
We certainly have never held that counsel’s effort to present some mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant. To the contrary, we have consistently explained that the Strickland inquiry requires [a] ... probing and fact-specific analysis....
Sears v. Upton, _ U.S. _, 130 S.Ct. 3259, 3266, 177 L.Ed.2d 1025 (2010).
Both prongs of the Strickland test present mixed questions of law and fact. Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004). “In reviewing a trial court’s ruling after an evidentiary hearing on an ineffective assistance of counsel claim, this Court defers to the factual findings of the trial court to the extent that they are supported by competent, substantial evidence, but reviews de novo the application of the law to those facts.” Mungin v. State, 932 So.2d 986, 998 (Fla.2006).

I. Mitigating Evidence Claim

In this claim, Hildwin asserts that defense counsel was ineffective in various respects with regard to the investigation and presentation of mental health mitigation during Hildwin’s 1996 resentencing proceeding. Hildwin’s primary claims are that defense counsel were deficient for failing to call Dr. Carbonell, a clinical psychologist, as an expert witness and for failing to provide Dr. Berland with institutional records and sufficient information to contact certain lay witnesses.[5] His argument *188 is that there must have been ineffective assistance of counsel because in granting a new penalty phase this Court quoted the trial court’s statement that the expert mental health testimony was “most persuasive and convincing”; however, on re-sentencing, the trial court found fault with the mental health mitigation presentation, as outlined in the trial court’s sentencing order.
We begin our analysis of this claim by noting that this is Hildwin’s second penalty phase. Thus, Hildwin’s claim “must be analyzed in light of the fact that this was a resentencing and that his counsel, in preparing for the second penalty phase, had the advantage of analyzing the first penalty phase, which resulted in a sentence of death.” Derrick v. State, 983 So.2d 443, 458 (Fla.2008). At the first penalty phase, defense counsel did not present any mental health mitigation and very little in the way of mitigation by lay witnesses. The jury unanimously recommended death. In contrast, at resentenc-ing, two mental health experts testified, both of whom diagnosed Hildwin with brain damage and mental illness. Further, testimony was presented as to the horrific conditions of Hildwin’s childhood and the abuse inflicted by his father. The jury recommended death by a vote of eight to four.
Hildwin first contends that defense counsel were ineffective for failing to present Dr. Carbonell as an expert witness in the 1996 penalty phase. Dr. Carbonell testified at the 1992 evidentiary hearing on Hildwin’s initial postconviction motion from his first penalty phase, and her testimony was part of the basis on which this Court granted Hildwin the new penalty-phase proceeding. In support of this claim, Hildwin points out that in reversing for a new penalty phase, this Court noted that the trial court had found the testimony of the mental health experts offered at the 1992 evidentiary hearing—Drs. Maher and Carbonell—“most persuasive and convincing.” Hildwin II, 654 So.2d at 109 n. 8. In contrast, after the new penalty phase, the trial court found that the opinions of the experts — Drs. Maher and Berland—would be “based on extrapolation, speculation, and conjecture” regarding Hildwin’s state of mind at the time of the murder. Thus, Hildwin argues, defense counsel were ineffective for failing to present an expert that was previously found to be “most persuasive and convincing,” contending that counsel’s ineffectiveness is demonstrated by the markedly different conclusion reached after the new penalty phase in which Dr. Carbonell did not testify-
“[T]he defendant bears the burden of proving that counsel’s representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy.” Asay v. State, 769 So.2d 974, 984 (Fla.2000). Hildwin has not met that burden in this ease. Hildwin’s defense counsel testified at the evi-dentiary hearing that Dr. Carbonell would *189 have been an unwilling and hostile witness at the 1996 penalty-phase proceeding if she were called to testify. As stated by the trial court in its order on this claim: “Clearly, defense counsel cannot be admonished for the strategic decision not to call an expert witness who openly admits that they would not be helpful to the defense.” We conclude that the decision not to call Dr. Carbonell to testify at the 1996 penalty-phase proceeding was a matter of sound trial strategy.[6]
Hildwin argues that, in the alternative to presenting Dr. Carbonell as an expert witness, defense counsel was ineffective for failing to provide Dr. Berland with institutional records already in the court file — on which Dr. Carbonell based her expert testimony at the 1992 eviden-tiary hearing — as well as sufficient information to contact certain lay witnesses who knew Hildwin around the time of the murder. From a review of Dr. Berland’s testimony at the new penalty-phase proceeding, it appears that Dr. Berland was not given the institutional records or provided sufficient information as to the witnesses. He testified at the proceeding that he did not rely on any records or institutional records that predated the murder; he “had the opportunity to look at some prison records after his incarceration, but nothing before.” Further, he stated at resentencing that he had “tried very hard” to contact witnesses who knew Hildwin after 1979 (the murder took place in 1985), but “was unsuccessful in doing so.” At the evidentiary hearing on this claim, Dr. Berland testified that he had asked for information in order to contact the lay witnesses, but was told that they were unavailable. Defense counsel did not give an explanation at the evidentiary hearing for why Dr. Berland was not provided with the records or the means to contact the witnesses.
The State points to Dr. Berland’s testimony at the evidentiary hearing that he has since reviewed the institutional records and interviewed the lay witnesses and that his opinions and conclusions remain unchanged from his 1996 testimony. However, Hildwin is not arguing that Dr. Berland’s testimony would have been different, but rather that the jury and the trial court would have accorded more weight to the testimony. On cross-examination, the State was able to highlight Dr. Berland’s failure to review the records or speak with lay witnesses who knew Hild-win at the time of the murder. Hildwin also points to the trial court’s resentencing order, in which the court stated that the expert testimony had “the problem of not having talked to sufficient people who knew the defendant around the time of the crime,” specifically that “Dr. Berland testified that he talked to no one who knew the defendant after 1979, and thus didn’t talk to any people who had been around the defendant close to the time of the murder.”
We first note that Hildwin has not demonstrated that the witnesses were available to be contacted in 1996. In fact, the State moved to have the prior testimony of one of the witnesses read into the record because neither the State nor defense counsel had been able to find her. Further, none of the witnesses testified at the evi-dentiary hearing on this claim. Lastly, when Dr. Berland was finally able to interview the witnesses, he did not ask them whether they were available in 1996. If *190 the witnesses were unavailable in 1996, defense counsel cannot be ineffective for failing to provide Dr. Berland with the means to contact them.
Assuming that defense counsel were deficient in not providing Dr. Ber-land with the institutional records and assuming that more weight would have been given to the mental health mitigation, Hildwin has still failed to demonstrate prejudice. Based on a review of the evi-dentiary hearings and the new penalty-phase trial, we conclude that in light of the aggravators and mitigators, Hildwin has not demonstrated that confidence in the outcome of the penalty-phase proceeding has been undermined. Porter, 130 S.Ct. at 455-56.[7] Even with more weight given to the mitigation, there remain four aggravators: prior violent felony, murder committed while under a sentence of imprisonment, HAC, and pecuniary gain. The HAC and prior violent felony aggravators have been described as especially weighty or serious aggravators set out in the sentencing scheme. Frances v. State, 970 So.2d 806, 817 (Fla.2007) (describing prior violent felony aggravator as “especially weighty” (citing Ferrell v. State, 680 So.2d 390, 391 (Fla.1996))); Buzia v. State, 926 So.2d 1203, 1216 (Fla.2006) (describing HAC as one of the “most serious aggravators set out in the statutory sentencing scheme” (quoting Larkins v. State, 739 So.2d 90, 95 (Fla.1999))). Further, the trial court found in its resentencing order that the mitigators were “greatly outweighed” by the aggravators, noting in particular the “senselessness,” “needlessness,” “heartlessness,” and “callousness” of the murder:
Finally, the Court is struck by the stark senselessness and pure needlessness of the murder. At the time of the murder, it would appear that the defendant was decently situated materially. He had gotten out of prison and had relocated to Florida. While true that he was on parole, he lived a fairly normal life. He had a girlfriend, and he lived with his father in a mobile home in the woods. He was living like a normal citizen. The evidence of this case indicated that the defendant enjoyed the things that most of us enjoy, the company of friends, movies, and so forth. Yet the defendant was apparently not satisfied by this peaceful coexistence. For some strange reason, not nearly understandable, even given the intense psychological scrutiny to which the defendant has been subjected, the defendant decided to commit a senseless, wasteful, and unnecessary murder, apparently motivated primarily for economic gain. He brutally killed a young woman merely to acquire some money with which to put gas in his car, and for a few personal possessions with which to stock his bedroom. This ruthless, savage, cruel and unnecessary murder cannot be lawfully justified under any circumstances present in this case, even considering the mitigating factors present, and giving them some weight. It is true that the childhood of the defendant was horrible; the defendant had a history of substance and drug abuse; that based on the psychological experts he suffered from, organic brain damage; that he has the ability to do well in a structured setting; and that his type of mental illness is appropriate and treatable in a prison *191 setting. Nevertheless, these mitigating factors are greatly outweighed by the heartlessness and callousness of the murder ofVronzettie Cox.
(Emphasis added.) Accordingly, we conclude that Hildwin has not demonstrated prejudice, and therefore his claim of ineffective assistance of counsel must fail.

II. Closing Argument Claim

Hildwin next contends that defense counsel Richard Howard was ineffective for failing to object to the following statements made by the State during closing argument:
In weighing the circumstances that are before you, it is the choices made by Paul Hildwin which far outweigh everything that had ever happened to him in his own life.
When he got out of that car on the side of the road without gas, he had a choice to make.
[[Image here]]
Paul Hildwin held Vronzettie Cox’s life in his balance. And on this side of the balance was Vronzettie Cox’s life. On this side of the balance was this cheap little radio, a pearl that she had gotten out of an oyster at Silver Springs and $75. And he weighed that against her life.
And for Vronzettie Cox, Paul Hildwin chose death and not life. And as we choose, our lives are formed. In choosing for Vronzettie Cox. [sic] Paul Hild-win chose for himself. He chose his own fate. And just as for Vronzettie Cox, he chose death and not life. Thank you, Your Honor.
(Emphasis added.) Specifically, Hildwin asserts that the statements were an improper eye-for-an-eye argument, analogous to a mercy argument, and an improper appeal to the sympathies of the jurors. At the evidentiary hearing on this claim, counsel testified that he made a strategic decision not to object to these comments.[8]
In order to prevail on an ineffective assistance of counsel claim on this ground, Hildwin “must first show that the comments were improper or objectionable and that there was no tactical reason for failing to object.” Stephens v. State, 975 So.2d 405, 420 (Fla.2007). Second, he must demonstrate prejudice.
“Closing argument is an opportunity for counsel to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.” Merck v. State, 975 So.2d 1054, 1061 (Fla.2007). However, prosecutorial arguments that “unnecessarily] appeal to the sympathies of the jurors” are improper. Nowell v. State, 998 So.2d 597, 607 (Fla.2008). An example of an improper argument that unnecessarily appeals to the sympathies of the jurors is the “mercy” argument, in which a prosecutor argues that the jury should show the defendant the same mercy that the defendant showed the victim. See id. “This Court has consistently held that it is improper during closing argument for the prosecutor to encourage the jury to show a defendant the same amount of mercy as he showed his victim because such argument tends to unnecessarily appeal to the sympathies of the jury.” Conahan v. State, 844 So.2d 629, 640-41 (Fla.2003).
Even assuming that the argument was improper, we conclude that Hildwin has failed to demonstrate prejudice. This Court has previously stated that “a mercy argument standing alone does not constitute reversible error.” Merck, 975 So.2d at 1062 (citing Reed v. State, 875 So.2d 415, 438 (Fla.2004)). In that case, this *192 Court concluded that no relief was warranted where “the mercy comments were not dwelled upon or emphasized in the context of the entire closing.” Id. Here, while the prosecutor at length described the choices that Hildwin had made in his life, the arguably improper comments— that by choosing death for the victim, Hild-win chose death for himself — are relatively brief and not emphasized by the prosecutor. Accordingly, we conclude that Hild-win has not demonstrated prejudice on this claim and thus his claim of ineffective assistance of counsel must fail.
CONCLUSION
For the foregoing reasons, we affirm the trial court’s denial of Hildwin’s motion for postconviction relief.
It is so ordered.
CANADY, C.J., and PARIENTE, QUINCE, POLSTON, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.

. Because the order concerns postconviction relief from a sentence of death, this Court has jurisdiction. See art. V, § (b)(1), Fla. Const.

. The following claims raised in the motion were summarily denied: (1) violations of chapter 119, Florida Statutes, because various agencies have not furnished public records to the records repository or to defense counsel; (2) ineffective assistance of penalty-phase counsel for failing to investigate, prepare, and present evidence regarding the circumstances of the offense; (3) ineffective assistance of penalty-phase counsel for failing to request an instruction pursuant to Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), pertaining to Hildwin’s ineligibility for parole; (4) the death sentence was based on consideration of two invalid aggravating circumstances and penalty-phase counsel was ineffective in failing to request a limiting instruction on the same; (5) the resentencing jury was preconditioned to recommend death because the jury heard that Hildwin had been previously found guilty, and penalty-phase counsel was ineffec *186 tive for failing to request an instruction pursuant to Hitchcock v. State, 673 So.2d 859 (Fla.1996), to advise the resentencing jury on its proper role; (6) Florida’s death penalty statute is unconstitutional under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and (7) Hildwin may be incompetent at the time of execution.

. William Hallman and Richard Howard are now circuit court judges.

. We reject the State's contention that Hild-win has abandoned or waived the claims at issue in this case. The delay between the filing of the postconviction motion and the evidentiary hearing was caused by the unique and unusual procedural posture of this case. While the postconviction motion at issue was pending in the trial court, DNA testing was conducted on two items found at the crime scene. The DNA test excluded Hildwin as the source of the DNA profile found on the items, and Hildwin moved for postconviction relief on the basis of the test results. The trial court denied relief, and this Court agreed in a four-three decision, holding that "[ajlthough the newly discovered DNA evidence is significant, this evidence is not ‘of such nature that it would probably produce an acquittal on retrial.’ " Hildwin v. State (Hildwin IV), 951 So.2d 784, 789 (Fla.2006).
The DNA results are also the subject of a pending all-writs petition in this Court, which seeks to have the DNA profile compared to DNA profiles in CODIS (the FBI-maintained national DNA databank) and the Florida statewide databank for the purpose of identifying the source of the DNA. See Hildwin v. State, No. SC10-1082 (Fla. pet. filed June 9, 2010).

. Hildwin summarily contends that defense counsel was ineffective for failing to supervise the investigator and in rushing both experts. These claims were not raised below and thus are procedurally barred. See Green v. State, *188 975 So.2d 1090, 1104 (Fla.2008). We further conclude that they are without merit.
Hildwin also summarily asserts that defense counsel was ineffective for failing to develop and present evidence of posttraumatic stress disorder (PTSD) and organic brain damage. As to PTSD, Hildwin presented the expert testimony of Dr. Greenbaum at the evidentia-ry hearing, who diagnosed Hildwin with PTSD. However, Dr. Greenbaum’s testimony was vague and nonspecific, and he could not connect the diagnosis to the murder. Further, Hildwin does not assert how the failure to develop and present evidence of PTSD prejudiced him. As to the organic brain damage claim, we first note that the trial court found organic brain damage as a nonstatutory miti-gator. Second, Hildwin has not demonstrated deficiency or prejudice as to this claim.

. To the extent that Hildwin asserts that defense counsel should have presented Dr. Car-bonell’s prior testimony from the 1992 evi-dentiary hearing in lieu of her live testimony, the record reflects that defense counsel attempted to do so; however, their motion to use her prior testimony was denied by the trial court.

. Hildwin suggests that this Court should consider in its prejudice analysis the DNA test results that exclude Hildwin as the source of the DNA profile found at the crime scene. However, the DNA results go to the issue of guilt, and this Court has previously made it clear that lingering doubt is not a valid mitigating circumstance. Reynolds v. State, 934 So.2d 1128, 1152 (Fla.2006).

. Defense counsel did not object at any point during the State’s closing argument.